**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**(Southern Division)**

HANNAH SMITH,

    Plaintiff,

v.

UNIVERSITY OF MARYLAND,
COLLEGE PARK
1101 Main Administration Building
University of Maryland
College Park, Maryland 20742-5025

SERVE ON:
    Brian Frosh, Attorney General
    Civil Litigation Division
    Office of the Attorney General
    200 St. Paul Place
    Baltimore, Maryland 21202-2021

    Defendant.

## COMPLAINT

Plaintiff, Hannah Smith, through undersigned counsel, files suit against the University of Maryland and alleges as follows:

## PRELIMINARY STATEMENT

The Plaintiff, Hannah Smith, was an honors student at the University of Maryland ("UMD") with a major in Communication and a cognate in Business. She proudly joined the Class of 2019 at UMD after earning an associate's degree. Smith has Celiac Disease and must adhere to a strict gluten-free diet. If she is exposed to gluten, she not only becomes seriously ill but increases her risk of long-term consequences such as intestinal cancer.

1

Smith notified UMD of her Celiac Disease and was assured that she could trust UMD's food. Despite UMD's promises and assurances, UMD did not train its staff or act with the promised care, instead repeatedly serving Smith gluten-containing foods causing severe illness. As a result of UMD's failure to keep its promises and make reasonable modifications for Smith, she became gravely ill and suffered short-term and long-term physical and emotional consequences.  As a student living in and having paid for on-campus housing and dining hall access, she was dangerously captive and at risk. Smith did not have the safe access or full and equal access to the education and college experience she was promised and that students without disabilities experience.  UMD's conduct violated Title II of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12131 et seq., and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794.

## THE PARTIES

1. Plaintiff Hannah Smith was a student at the University of Maryland, College Park. She lived in university housing during the academic year but otherwise resides with her parents at 824 Shriver Avenue, Cumberland, Maryland 21502.

2. The Board of Regents of the University System of Maryland is the governing body for all University of Maryland campuses, of which The University of Maryland, College Park is the "flagship" campus located in College Park, Maryland.

## JURISDICTION AND VENUE

3. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343.

4. Venue in this Court is proper because the University of Maryland has a campus in College Park, which is in Prince George's County.

## FACTUAL ALLEGATIONS

4.      After becoming gravely ill in her teens, Smith was diagnosed with Celiac Disease by specialists and placed on a medically necessary gluten-free diet.

5.      Celiac Disease is an inherited, auto-immune disease affecting approximately 1% of the population. It is typically diagnosed by blood test and then confirmed by endoscopy. Celiac Disease has no cure.

6.      The only treatment for Celiac Disease is to maintain a strictly gluten-free diet.

7.      Gluten is the name for proteins contained in wheat, barley, malt, and triticale.

8.      When a person with Celiac Disease consumes gluten, that person's body responds by attacking itself, causing damage to intestinal walls and setting off a host of symptoms that can be life-altering and life-threatening.

9.      For example, ingestion of gluten by an individual with Celiac Disease can result in vomiting, stomach pain, neuropathic pain, severe gastrointestinal distress, loss of consciousness, neurological symptoms, confusion, exhaustion, persistent rash, and stroke.

10.     In addition to illness that can last days to months, ingestion of gluten in those with Celiac Disease has serious long-term physical repercussions. Research confirms that consumption of gluten by individuals with Celiac Disease increases risk of muscular dystrophy and significantly increases the risk of some cancers, particularly intestinal cancers. Likewise, a person with Celiac Disease who ingests gluten is more likely to develop Non-Hodgkin lymphoma.

11.     The impact of gluten ingestion on a person with Celiac Disease can have a profound psychological, social and educational impact. Gluten ingestion by individuals with Celiac Disease causes anxiety and depression, as well as decreased quality of life and educational challenges.

12. Ingestion of gluten can occur when those who prepare food do not act with the care required causing ingestion of foods with known gluten-containing ingredients or when foods that do not contain gluten come into cross-contact with gluten when prepared using shared kitchen equipment, shared preparation surfaces, or shared utensils.

13. Smith was thrilled to earn admission to UMD after earning an associate's degree at a local community college.

14. In late July 2017, prior to committing to live on campus, Smith and her father contacted UMD and asked for a meeting to request reasonable modifications to ensure Smith could safely eat at the dining halls on campus.

15. Resident students on campus at UMD must buy into a meal plan. In exchange for having paid full price for a meal plan, the resident students have access to all dining halls on campus and to eat as much as they desire while at the dining halls.

16. In August 2017, before committing to live on campus, Smith and her parents met in person with Maureen Schrimpe and Chef John Gray, both staff with UMD Dining Services.

17. The Smith family provided UMD with medical documentation of Smith's diagnosis and need for strictly gluten-free meals.

18. The Smith family likewise explained the severity of Smith's reactions to gluten and stressed the importance of keeping her safe and healthy.

19. UMD assured the Smith family that staff had been and would continue to be trained on gluten-free food preparation, storage, and service, including the risks of cross-contact.

20. UMD offered to provide Smith with a copy of the food symbols in the dining hall that UMD claimed would clearly identify food that was safe for Smith to consume.

21. UMD assured Smith that it would provide her with safe, gluten-free food to eat in its dining halls.

22. Smith relied on UMD's promises in entering into a dining services contract with UMD that same day after the meeting with UMD Dining Services staff.

23. Smith began her first year at UMD as a junior living in the dormitory on campus and having paid for the required meal plan in the Fall of 2017.

24. In the months that followed, UMD repeatedly served Smith with gluten-containing foods despite its promises that it would serve her gluten-free foods that were safe for her to eat.

25. Gluten is not visible, and therefore Smith had no choice when eating on campus but to rely on UMD's promises that it would serve her safe food.

26. Smith did not have a car on campus so was beholden to the UMD Dining Services for all her meals.

27. As a result of eating gluten-containing foods that UMD served or provided her, Smith became seriously ill.

28. For example, on or about October 1, 2017, dining services staff provided Smith with Frosted Flakes cereal. Smith inquired whether the cereal was gluten-free and was assured not only that it was gluten-free but also that dining services recommended that cereal to other students with Celiac Disease.

29. Frosted Flakes contains gluten.

30. Shortly after consuming Frosted Flakes based upon UMD's assurances that it was safe for her, Smith because seriously ill. She vomited so intensely that blood vessels throughout

her face burst. She experienced brain fog, difficulty walking, uncontrollable vomiting, and rib pain as the result of projectile vomiting. The impact of this incident lasted for weeks.

31. That same day, Smith's father called Chef Gray to make sure he was aware that Smith had become seriously ill as the result of food provided by UMD. Chef Gray conceded that the dining services staff who advised Smith that the cereal was safe for her and for all individuals with Celiac Disease was wrong.

32. Later that same day, however, another incident occurred. While Smith was recovering from the Frosted Flakes incident, she requested a bowl of gluten-free vegetable soup – a "sick meal" option available to all students that could be picked up at the dining facility and taken back to her room.

33. When Smith picked up the vegetable soup, it was in a plain white Styrofoam container with no label.

34. Smith asked the staff member who provided the soup to confirm that it was in fact gluten-free.

35. The staff person assured Smith that the soup was gluten-free and that he had taken the extra step of preparing a second container of gluten-free soup for Smith to get the next day.

36. Smith returned to her room and began eating the soup. She noticed there was something in the soup of a texture she had not eaten before and asked her roommate to look at the soup and tell her what it was. Her roommate recognized the mystery ingredient as barley.

37. Barley contains gluten.

38. Smith panicked and returned immediately to the dining facility to ask if the soup contained barley. The same staff member brought Smith back into the kitchen to show her the

label on the soup. The staff member then confirmed to Smith that the soup contained barley and informed Smith that he had been told that barley is gluten-free.

39. Smith told the staff member that she and her parents had repeatedly informed Chef Gray and the university that wheat, rye, barley, oats, brewer's yeast, and malt all contain gluten.

40. At this point, Smith was already becoming increasingly ill. She left the dining facility only to become incapacitated on the way back to her dormitory. She struggled to stand against a tree, vomiting uncontrollably. She then fell and could not stand again. In the course of violent vomiting, she urinated and defecated in her pants. Covered in vomit, urine, and feces, Smith struggled to get back to her room.

41. Smith called her parents crying and ill and begging for help.

42. Smith's father again called Chef Gray. He implored him to act with more care towards his daughter. He reiterated the importance of basic training for the staff who prepared and served his daughter's food. He told Chef Gray that UMD's negligence was making his daughter ill and was interfering with her studies. Smith's father stressed again to Chef Gray that in addition to the immediate symptoms of consuming gluten — vomiting, diarrhea, pain, fatigue, mental confusion — there were serious long-term consequences of what UMD was doing to his daughter — malnourishment, vitamin deficiency, infertility, and significantly increased risk of diseases such as cancer and lymphoma. Smith's father reminded Chef Gray that UMD needed to provide food that was safe for his daughter to eat and that anyone preparing or serving her food had to be competent to do so safely.

43. Finally, Smith's father expressed concern that UMD's negligence was resulting in academic impact on Smith who was an honors student and that she was suffering greatly as the result of UMD's negligence.

44. Chef Gray informed Smith's father that some new staff had been hired but that he would make sure they were trained on gluten and food safety for students with Celiac Disease.

45. A few days later, when Smith returned to the dining facility to pick up gluten-free toast she had requested for breakfast, a staff member provided her toast that had been blackened delivered with the message: "You know, I got called on the carpet because nobody told me that malt had gluten in it. Here's your breakfast. I hope you enjoy your 'gluten free' toast." Not only was the toast inedible, but based on the anger with which the message was delivered by the staff, Smith was afraid to eat it.

46. Following this incident, Smith's father again contacted Chef Gray to inform him what had happened with the toast.

47. Smith, who had been an honors student with high standards for herself, was unable to maintain her grades due to constant illness caused by UMD. She took a winter session course in an effort to remediate a low grade that she received as a result of these incidents.

48. On or about February 24, 2018, in the morning, Smith went to pick up breakfast she had ordered for a trip to the National Gallery of Art. She got the food which included a hash brown directly from staff, and inquired to make sure it was gluten-free. Staff assured her that the food they were giving her was gluten-free.

49. The food, however, contained wheat. Smith ate the breakfast that UMD had assured her was safe and became gravely ill. She began vomiting violently. She attempted to call her parents but was so ill she could not speak.

50. 9-1-1 was called and Smith was rushed to Washington Adventist Hospital.

51. Smith went in and out of consciousness and her skin turned gray. Even with intravenous medication, Smith continued to vomit for hours, causing blood vessels throughout her body to burst and causing trauma to her body.

52. Smith missed six days of classes but her illness continued even as she struggled to return to class.

53. Before she returned to campus, Smith's father requested yet another meeting with UMD to include Chef Gray and his supervisor. Smith and her father then met with the director of Dining Services and Chef Gray and stated that it was clear that staff had not been trained as they had been promised and as would be required for basic safety. Smith's father further stated that the failure of UMD to provide food that was safe for his daughter to eat denied her access to education and risked her mental and physical health.

54. Chef Gray proposed that going forward, Smith obtain her food only from a chef supervisor. Smith agreed to this proposal, relying on Chef Gray's assurances that the food would be safe for her.

55. On or about April 17, 2018, Smith went to the dining facility to pick up a meal she had requested from the chef supervisor. After consuming the meal that consisted of eggs, sausage and a hash brown, Smith began vomiting violently. She urinated and defecated in her pants due to the force of the vomiting. A friend helped Smith get medical help at the Student Health Center.

56. After observing Smith's condition and concluding that it was the result of exposure to gluten, UMD's physician advised Smith not to eat meals at the university dining facility.

57. Smith's father yet again called Chef Gray who assured him that Smith's meal had not contained any gluten.

58. Subsequently, Chef Gray contacted Smith's father to admit that the food Smith had been served had again contained gluten.

59. A few days later, an employee who was concerned for Smith's safety told her privately that UMD did not take food allergies seriously and showed Smith the package label for the hash browns which clearly stated that the hash browns contained wheat.

60. For the remainder of the semester, while other students could eat anywhere safely on campus, Smith survived largely on packaged food items – sealed tuna packets, gluten-free breakfast bars and fruit. For other safe foods, she had to walk miles off campus.

61. UMD ordered some gluten free foods but then stored those foods in a manner that rendered them unfit for consumption.

62. As a result of UMD's actions, Smith developed dermatitis herpetiformis – a persistent rash caused by gluten ingestion in those with Celiac Disease – all over her face. She began covering her face with a scarf to hide the humiliating rash.

63. Not only was Smith's physical and emotional health compromised, her education was compromised as well.

64. In an effort to remediate the impact of being constantly ill during the school year, she took a summer class.

65. In order to return to campus for her senior year, Smith was forced to opt out of dormitory housing in favor of more expensive university-owned apartments that would allow her access to a kitchen where she could prepare food herself rather than rely on UMD's repeatedly broken promises that it would prepare safe food for her.

66. The effects of UMD's actions were profound and damaging on all aspects of Smith's life. These incidents were also eminently preventable. Universities throughout the United States routinely provide safe food for students, including students with Celiac Disease.

67. UMD's failure to do so was a violation of the most basic standard of care it owed Smith. It was also a denial of education and meal plan for which Smith had paid and to which students without disabilities had access.

68. Smith was student at UMD without access to safe dining facilities.

69. UMD did not refund any of the money it took from Smith in providing her with foods containing gluten.

70. UMD also charged Smith more to live in an on-campus apartment with a kitchen even though its failure to provide her with safe food options forced her to pay more for an apartment with a kitchen so she could prepare her own food.

71. As a result of UMD's failure to provide safe food options and repeatedly exposing her to gluten, Smith suffered severe emotional harm including but not limited to humiliation, frustration, and emotional stress. Smith suffered financial and physical harm as the result of UMD's discrimination.

72. Smith also was denied a full and healthy educational experience that is offered by UMD to students without disabilities.

73. UMD is a recipient of federal financial assistance.

**COUNT I**
**SECTION 504 OF THE REHABILITATION ACT OF 1973**

74. Plaintiff, Hannah Smith, repeats and re-alleges the foregoing paragraphs in support of her claims.

75. Smith was a qualified individual with a disability under Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 because she was substantially limited in the major life activities of, *inter alia*, eating and was a student at the University of Maryland.

76. UMD is a recipient of federal financial assistance.

77. UMD discriminated against Smith solely on the basis of disability by failing to make reasonable modifications to ensure that she has an opportunity equal to that of classmates to eat safe food prepared by UMD and offered students.

78. UMD's failure to make reasonable modifications was intentional.

79. UMD retaliated against Smith for asserting her rights when it intentionally burned her food after she reported having been served gluten-containing food, and UMD delivered the burned food with a message intended to make her feel unsafe eating campus food.

80. Smith suffered physical, emotional, and financial harm as the result of Defendant's conduct.

81. Smith was forced to spend money not required of students without disabilities, she had to walk to purchase her own safe food despite having a meal plan, and she was forced to pay extra for a university-owned apartment with a kitchen that was necessary only because UMD was unable and/or unwilling to serve her safe food.

## COUNT II
## AMERICANS WITH DISABILITIES ACT

82. Plaintiff, Hannah Smith, repeats and re-alleges the foregoing paragraphs in support of her claims.

83. Title II of the ADA states that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the

services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132(a).

84. Defendant is a public entity.

85. Smith is an individual with a disability because he is substantially limited in the major life activities of, *inter alia*, eating.

86. Smith is qualified to eat food prepared by UMD because she is a student of UMD and/or eligible to eat in UMD dining places open to members of the public.

87. UMD discriminated against the Plaintiff on the basis of disability by failing to make reasonable modifications to ensure that she has an opportunity equal to that of classmates to eat safe food prepared by UMD and offered students.

88. UMD's failure to make reasonable modifications was intentional.

89. UMD retaliated against Smith for reporting that she became ill as the result of UMD's actions by intentionally preparing inedible food given to her with a message designed to make clear she should not have asserted her rights and that her food would not be safe.

90. Smith suffered physical, emotional, and financial harm as the result of Defendant's conduct.

## DEMAND FOR JURY TRIAL

Smith demands a jury trial in this action for all claims so triable.

## RELIEF

WHEREFORE, Smith respectfully requests that the Court provide the following relief:

a. Issue a declaratory judgment that UMD subjected Smith to physical, emotional, and financial harm and discriminated against her on the basis of disability;

b. Award compensatory damages;

c. Award reasonable costs and attorneys' fees; and

d. Award any and all other relief that may be necessary and appropriate.

                                                Respectfully submitted,

                                                s/ Mary C. Vargas  
                                                Mary C. Vargas  
                                                STEIN & VARGAS, LLP  
                                                10 G Street NE, Suite 600  
                                                Washington, DC 20002  
                                                Tel: (240)793-3185  
                                                Fax: (888) 778-4620  
                                                mary.vargas@steinvargas.com

Date:  February 20, 2020